# EXHIBIT 1

**Plaintiffs' Exhibit 1 – Response to Defendant's Separate Statement of Undisputed Material Facts**

Movant's Supporting Statement:

| Moving Party's Undisputed Material Facts and Supporting Evidence | Opposing Party's Response/Additional Facts and Supporting Evidence | Moving Party's Reply and Supporting Evidence |
| --- | --- | --- |
| 1. Clayton Group Holdings, Inc. ("Clayton" or "the Company") provides mortgage and real estate risk management solutions to financial institutions. **Ex. B** (*Derix decl., ¶ 4*). | Undisputed. | |
| 2. Following the 2008 real estate crash, much of the Company's work shifted to mortgage loan audits. In short, Clayton was retained by various mortgage loan lenders to review loan files and check the work of the lender's loan servicers. **Ex. B** (*Derix decl., ¶ 5*). | Undisputed. | |
| 3. In late 2011, the Company began work on an audit project for Bank of America (BoA). **Ex. B** (*Derix decl., ¶ 6*). | Undisputed. | |
| 4. The BoA project was handled by the Clayton Fixed Income Services (CFIS) group in Denver. **Ex. B** (*Derix decl., ¶ 7*). | Undisputed. | |
| 5. Jennifer Harrison, Senior Vice President, had overall responsibility for CFIS, and Angie Derix, Director, was responsible for the BoA project. **Ex. B** (*Derix decl., ¶ 8*). | Undisputed. | |

| | | |
|---|---|---|
| 6. At the outset of the project, Compliance Analysts, *i.e.*, those employees performing file reviews, reviewed all of the different types of loan files, *e.g.*, loans in foreclosure, bankruptcy, etc., for all of BoA's loan servicers. **Ex. B** (*Derix decl., ¶ 9*). | Undisputed. | |
| 7. As the project grew, the Company created teams based on specific servicers. **Ex. B** (*Derix decl., ¶ 10*). | Undisputed. | |
| 8. In 2014, however, the Company decided the work could be done more efficiently and effectively if certain employees focused on certain types of files, rather than certain servicers. **Ex. B** (*Derix decl., ¶ 11*). | Undisputed. | |
| 9. The Company restructured the teams based on the different types of files – Consumer Financial Protection Bureau (CFPB), bankruptcy, foreclosure, and loss mitigation. **Ex. B** (*Derix decl., ¶ 12*). | Undisputed. | |
| 10. In 2015, the Company added a fifth team – Servicemembers Civil Relief Act (SCRA)/flood. **Ex. B** (*Derix decl., ¶ 13*). | Undisputed | |
| 11. Compliance Analysts were assigned to teams by management based on the Company's workload, the clients' deadlines, and the employees' experience. | Disputed.  Minority employees were packed into the loss mitigation and foreclosure teams. | |

| | | |
|---|---|---|
| **Ex. B** (*Derix decl., ¶ 14*). | (Ex. 2, ¶¶ 11–13; Ex. 3, ¶¶ 5–7; Ex. 4, ¶¶ 5–7; Ex. 12 para. 4) | |
| | 1.   Mr. Powell had raised the concern that the composition of the teams was racially biased with management.<br><br>(Exhibit 13 at 40:4–8). | |
| 12. Compliance Analysts performed the same type of work and had the same responsibilities before and after the team restructuring.<br>**Ex. B** (*Derix decl., ¶ 15*). | Disputed. The work on the foreclosure and loss mitigation teams were more difficult and scored more severely in a way that did not account for the increased difficulty or shifting standards.  This meant members on those teams were less likely to earn performance-related bonuses.<br><br>(Exhibit 2, ¶¶ 11–13; Exhibit 3, ¶¶ 5–7; Exhibit 4, ¶¶ 5–7; Exhibit 12 para. 4) | |
| 13. The Compliance Analysts' working conditions, compensation and benefits did not change in connection with the team restructuring.<br>**Ex. B** (*Derix decl., ¶ 16*). | Disputed.  The work on the foreclosure and loss mitigation teams were more difficult and scored more severely in a way that did not account for the increased difficulty or shifting standards.  This meant members on those teams were less likely to earn performance-related bonuses.<br><br>(Exhibit 2, ¶¶ 11–13; Exhibit 3, ¶¶ 5–7; Exhibit 4, ¶¶ 5–7; Exhibit 12 para. 4) | |
| 14. At all relevant times, there were minority and non-minority employees on each team. | Undisputed. | |

| | | |
|---|---|---|
| **Ex. B** (*Derix decl., ¶ 17*). | | |
| 15. Plaintiffs worked as Compliance Analysts on the BoA project. **Ex. B** (*Derix decl., ¶¶ 3, 18, 19, 21, 22, 23, 26, 27*). | Undisputed. | |
| 16. Plaintiff Justin Moreno began working for Clayton in mid-2014. **Ex. B** (*Derix decl., ¶ 18*). | Undisputed. | |
| 17. At all relevant times, Moreno was on the foreclosure team. **Ex. B** (*Derix decl., ¶ 19*) | Undisputed. | |
| 18. Although a solid performer, Moreno was counseled and disciplined on multiple occasions for engaging in unprofessional behavior, maintaining a negative PTO balance, taking excessive unexcused absences, taking breaks while loans were open, becoming confrontational with QC Analysts, and working outside the established workflow. **Ex. B** (*Derix decl., ¶ 20, Ex. 1*); **Ex. F** (*Moreno dep., pp. 94:3-105:14, 113:23-118:14,119:7-129:15, Exs. 10, 12*). | Disputed.  The violations Moreno was cited for were consistently and disproportionately applied to him and other minority employees.  Moreno was regularly targeted for discipline for practices which were tolerated from white, similarly-situated employees.  (Exhibit 3 ¶ 14–15; Exhibit 2, ¶ 8; Exhibit 12, ¶ 3). | |
| | 2.  Prior to his termination, Mr. Moreno regularly received bonuses for being the top analyst on the team he was on, and was rated as exceeding expectations for the entire year of 2015.  (Exhibit 13 at 65:18–66:2). | |

| | | |
|---|---|---|
| | 3.    Mr. Moreno's "exceeded expectations" rating accounted for both performance and behavior.<br><br>(Exhibit 3, ¶ 14; Exhibit 9 at 2; Exhibit 13 at 23:18–26:4). | |
| 19. Moreno alleges that he was "singled out" for "talking too loudly" and asking questions.<br>**Ex. F** (*Moreno dep., pp. 142:25-149:23, 152:18-153:14, Ex. 16*). | Undisputed. | |
| 20. Moreno claims that his supervisors closed loans on which he was working when he left his desk.<br>**Ex. F** (*Moreno dep., pp. 109:2-111:17*). | Undisputed. | |
| 21. In late 2015 and early 2016 Moreno complained to Malina Peterson, a Company trainer, and Lynda Malmborg, former Vice President, Human Resources, about his supervisor closing loans on which he was working if he left his desk.<br>**Ex. F** (*Moreno dep., pp. 111:18-113:22, 153:15-181:5, Exs. 17-20*). | Undisputed. | |
| 22. Malmborg investigated and concluded that Moreno was not being treated differently than other employees.<br>**Ex. I** (*Withrow dep., pp. 34:13-35:1*). | Disputed.  The violations Moreno was cited for were consistently and disproportionately applied to him and other minority employees.  Moreno was regularly targeted for discipline for practices which were tolerated from white, similarly-situated employees. | |

| | | |
|---|---|---|
| | (Exhibit 3 ¶ 14–15; Exhibit 2, ¶ 8; Exhibit 12, ¶ 3). | |
| 23. As a matter of practice, Clayton prohibited employees from leaving a loan module open while on break, as it impacted the group's and the employee's productivity metrics.<br>**Ex. E** (*Defendant's Objections and Responses to Plaintiff's First Set of Discovery ("Responses"), p. 8, Response to Interrogatory No. 17*). | Disputed.  The violations Moreno was cited for were consistently and disproportionately applied to him and other minority employees.  Moreno was regularly targed for discipline for practices which were tolerated from white, similarly-situated employees.<br><br>(Exhibit 3 ¶ 14–15; Exhibit 2, ¶ 8; Exhibit 12, ¶ 3). | |
| 24. Derwin Powell began working for Clayton in early 2013.<br>**Ex. B** (*Derix decl., ¶ 21*). | Undisputed. | |
| 25. When the Company restructured its teams in 2014, Powell initially was assigned to the loss mitigation team.<br>**Ex. B** (*Derix decl., ¶ 22*). | Undisputed. | |
| 26. In March 2015, Clayton reassigned Powell from the loss mitigation team to the foreclosure team, at his request.<br>**Ex. B** (*Derix decl., ¶ 23, Ex. 2*); **Ex. G** (*Powell dep., pp. 99:17-105:3*). | Undisputed. | |
| 27. Powell was regularly counseled about his poor performance, and in early 2016, was given a formal verbal plan with respect to his performance.<br>**Ex. B** (*Derix decl., ¶ 24, Ex. 3*); **Ex. G** (*Powell dep., pp.* | Disputed.  The violations Powell was cited for were consistently and disproportionately applied to him and other minority employees.  Powell was regularly targeted for discipline for practices which | |

| | | |
|---|---|---|
| *212:11-222:10, 224:16-226:20, Exs. 60-63).* | were tolerated from white, similarly-situated employees.<br><br>(Exhibit 2, ¶ 8; Exhibit 12, ¶ 3). | |
| 28. Powell received an overall rating of "Partially Met" on his 2014 performance evaluation, and an overall rating of "Did Not Meet" on his 2015 evaluation.<br>**Ex. G** (*Powell dep., pp. 223:23-234:13, 236:23-237:12, Exs. 69, 72).* | Undisputed. | |
| 29. Powell was moved to a desk outside of his supervisor's office in 2014 or early 2015.<br>**Ex. G** (*Powell dep., pp. 199:21-203:18).* | Undisputed. | |
| 30. According to Powell, his supervisor would yell from his office, "Are you guys working out there?"<br>**Ex. G** (*Powell dep., pp. 199:21-203:18).* | Undisputed. | |
| 31. According to Powell, sometime in 2015, a team lead made a comment about Powell being familiar with the "ghetto."<br>**Ex. G** (*Powell dep., pp. 192:16-196:8).* | Undisputed. | |
| 32. In the first quarter of 2015, Powell complained that his team had more difficult work than other teams and that his assignment to that team was based on his race.<br>**Ex. B** (*Derix decl., ¶ 25, Ex. 4);* **Ex. G** (*Powell dep., pp. 169:5-184:13, Ex. 58).* | Undisputed. | |

| | | |
|---|---|---|
| 33. The next day, Powell retracted his accusation, saying that he did not really believe that he had been discriminated against.<br>**Ex. B** (*Derix decl., ¶ 25, Ex. 4*); **Ex. G** (*Powell dep., pp. 226:22-228:10, Ex. 64*). | Disputed.  Powell never "retracted his accusation," although he was reprimanded for raising the issue and threatened with termination if he persisted in "making excuses."<br><br>(Exhibit 2, ¶¶ 15–19) | |
| | 4.   After these incidents, Powell no longer submitted "refutes" when his work was scored by Quality Control, because such efforts would be futile and likely met with further threats to his job.<br><br>(Exhibit 2, ¶ 20). | |
| 34. Rene Jesus Ramos began working for Clayton in 2012.<br>**Ex. B** (*Derix decl., ¶ 26*). | Undisputed. | |
| 35. Ramos left the Company in 2013 and returned in mid-2014.<br>**Ex. B** (*Derix decl., ¶ 26*). | Undisputed | |
| 36. At all relevant times, Ramos was on the loss mitigation team.<br>**Ex. B** (*Derix decl., ¶ 27*). | Undisputed. | |
| 37. Ramos was regularly counseled about his attendance and performance, and in January 2016 and again in February 2016, was given formal verbal plans for his attendance and performance, respectively.<br>**Ex. B** (*Derix decl., ¶ 25, Ex. 5*); **Ex. H** (*Ramos dep., pp.* | Disputed.  The violations Ramos was cited for were consistently and disproportionately applied to him and other minority employees.  Ramos was regularly targeted for discipline for practices which were tolerated from white, similarly-situated employees.<br><br>(Exhibit 4, ¶¶ 9–10). | |

| | | |
|---|---|---|
| *182:22-183:19, 191:17-205:1, Exs. 42-46).* | | |
| 38. Ramos received overall ratings of "Did Not Meet" on his 2014 and 2015 performance evaluations.<br>**Ex. H** (*Ramos dep., pp. 206:20-207:7, 209:23-201:7, Exs. 49, 50).* | Undisputed. | |
| 39. In mid- to late-2015, Ramos was promoted to Quality Control (QC) Analyst on a trial basis.<br>**Ex. B** (*Derix decl., ¶ 29).* | Undisputed. | |
| 40. QC Analyst is the typical next career step for a Compliance Analyst.<br>**Ex. B** (*Derix decl., ¶ 30).* | Undisputed | |
| 41. Although Ramos' performance as a Compliance Analyst was not meeting expectations at that time, he had shown some ability to perform well, and the Company needed a QC Analyst. Consequently, Ramos was given an opportunity to do the job.<br>**Ex. B** (*Derix decl., ¶ 31).* | Undisputed. | |
| 42. Ramos performed poorly as a QC Analyst and was moved back to Compliance Analyst after two to three months.<br>**Ex. B** (*Derix decl., ¶ 32).* | Disputed. | |
| 43. On two occasions in June 2015, Ramos received instant messages from another employee which he (Ramos) perceived to be racist. | Disputed – Ramos received racist instant messages on more than two occasions.<br><br>(Exhibit 4, ¶ 9, Exhibit 10). | |

| | | |
|---|---|---|
| **Ex. H** (*Ramos dep., pp. 139:19-140:9, 144:13-144:24, Exs. 34, 35*). | | |
| 44. In October 2015, Ramos' team lead sent an instant message to his team saying "this group maybe should go as the Special Olympics for halloween (sic)." **Ex. H** (*Ramos dep., pp. 153:6-153:15, Ex. 36*). | Undisputed. | |
| 45. According to Ramos, in February 2016, a QC Analyst (Maresa Barajas) said, in Ramos' presence, that merchandise prepared for the losing Super Bowl team probably was sent to South America. **Ex. H** (*Ramos dep., pp. 119:19-121:16*). | Undisputed. | |
| 46. Maresa Barajas is Hispanic. **Ex. B** (*Derix decl., ¶ 39*). | Undisputed. | |
| 47. Ramos alleges that he made multiple complaints about perceived discrimination or harassment beginning in the spring of 2015 and concluding in February 2016. Ramos alleges that he complained about the composition of the teams. He further alleges that Maresa Barajas, who is Hispanic, was giving him low grades because of his national origin. **Ex. H** (*Ramos dep., pp. 104:17-124:21, 133:1-139:14*). | Undisputed. | |

| | | |
|---|---|---|
| | 5.   In June of 2015, Ramos' supervisor sent him instant messages mocking his national origin, stating that another supervisor had said "la raza is for [dogs] and "fuk essays [sic]"<br><br>(Exhibit 4, ¶ 9, Exhibit 10). | |
| 48. Clayton investigated Ramos' complaint about Barajas and determined that it was unsubstantiated.<br>**Ex. C** (*L. Malmborg notes re: investigation*). | Disputed.  The document referenced reflect Ms. Malmborg's opinion that the comments were not discriminatory; and that she had not finished investigating the remainder of his complaints.<br><br>(Ex. C). | |
| 49. In late 2015, Clayton's senior management instructed Jennifer Harrison, Senior Vice President, the most senior management employee for the CFIS group in Denver, to prepare to reduce the group's headcount as a cost-saving measure.<br>**Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Disputed.  The group's headcount was not eliminated as a cost-saving measure. Plaintiffs' jobs were reposted the next day after they were terminated.<br><br>((Exhibit 2, Affidavit of Derwin Powell ¶¶ 23(a)–(g)); Exhibit 3 (Affidavit of Justin Moreno ¶¶ 17(a)–(g)); Exhibit 4 (Affidavit of Jesus Ramos ¶¶ 14 (a)–(h)); Exhibit 8 at 3, 6, 9)). | |
| 50. Harrison, instructed her direct reports, including Angie Derix, Director, to rank their reports on a scale of 1-4, with "1" being the lowest score and "4" the highest, using specified criteria. | Disputed.  Though Clayton acknowledged the creation of a spreadsheet and other documentation, it has never disclosed them.  Clayton has provided inconsistent information on the number of employees considered for | |

| | | |
|---|---|---|
| **Ex. D** (*Derix dep., pp. 55:21-56:6, Ex. 77*); **Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*); | termination, and ultimately terminated.<br><br>(Exhibit 13 at 83:18–84:9; Compare Exhibit E at 3–4 with Exhibit 5 at 2 (claiming reduction was from 54 to 46); id. at 8–9 ("Mr. Ramos and the other seven terminated employees . . .")); Exhibit 6 at 2, 9 (same w/r/t Moreno) Exhibit 7 at 2, 7 (same w/r/t Ramos)). | |
| 51. Harrison compiled that data, along with the unit's year-end performance data, to further discuss the rankings with her direct reports.<br>**Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Undisputed. | |
| 52. Harrison then asked her direct reports to review the individual contributors' performance with their managers.<br>**Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Undisputed | |
| 53. Using all of the information gathered, Harrison compiled an aggregate ranking of the CFIS group on or around January 4, 2016.<br>**Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Undisputed | |
| 54. Ten employees, including Plaintiffs, received the lowest ranking of "1." | Disputed.  Though Clayton acknowledged the creation of a spreadsheet and other documentation, it has never disclosed them.  Clayton has | |

| | | |
|---|---|---|
| **Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | provided inconsistent information on the number of employees considered for termination, and ultimately terminated.<br><br>(Exhibit 13 at 83:18–84:9; Compare Exhibit E at 3–4 with Exhibit 5 at 2 (claiming reduction was from 54 to 46); id. at 8–9 ("Mr. Ramos and the other seven terminated employees . . .")); Exhibit 6 at 2, 9 (same w/r/t Moreno) Exhibit 7 at 2, 7 (same w/r/t Ramos)). | |
| 55. Moreno received a ranking of "1" as a result of his attendance and conduct issues.<br>**Ex. B** (*Derix decl., ¶ 35*). | Disputed.  Moreno's ranking, and subsequent termination, was due to his national origin and/or participation in protected activity.<br><br>(Exhibits 2–15) | |
| 56. Powell received a ranking of "1" as a result of poor performance.<br>**Ex. B** (*Derix decl., ¶ 36*). | Disputed.  Powell's ranking, and subsequent termination, was due to his national origin and/or participation in protected activity.<br><br>(Exhibits 2–15) | |
| 57. Ramos received a ranking of "1" as a result of his poor performance and attendance.<br>**Ex. B** (*Derix decl., ¶ 37*). | Disputed.  Ramos' ranking, and subsequent termination, was due to his national origin and/or participation in protected activity.<br><br>(Exhibits 2–15) | |
| 58. Harrison initially was asked to provide a list of six individuals to be terminated.  She provided that list on January 13, 2016. | Disputed.  Clayton has provided inconsistent information on the number of employees considered for termination, and ultimately terminated. | |

| | | |
|---|---|---|
| **Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | (Compare Exhibit E at 3–4 with Exhibit 5 at 2 (claiming reduction was from 54 to 46); id. at 8–9 ("Mr. Ramos and the other seven terminated employees . . .")); Exhibit 6 at 2, 9 (same w/r/t Moreno) Exhibit 7 at 2, 7 (same w/r/t Ramos)). | |
| 59. Harrison then was asked to provide a list of five more individuals to be terminated.  She provided that list on January 29, 2016. **Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Disputed.  Clayton has provided inconsistent information on the number of employees considered for termination, and ultimately terminated.<br><br>(Compare Exhibit E at 3–4 with Exhibit 5 at 2 (claiming reduction was from 54 to 46); id. at 8–9 ("Mr. Ramos and the other seven terminated employees . . .")); Exhibit 6 at 2, 9 (same w/r/t Moreno) Exhibit 7 at 2, 7 (same w/r/t Ramos)). | |
| 60. The lists were reviewed and discussed by senior management, local management, and human resources. **Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Disputed.  Though Clayton acknowledged the creation of a spreadsheet and other documentation, it has never disclosed them.<br><br>(Exhibit 13 at 83:18–84:9). | |
| 61. Plaintiffs were included on the initial list. **Ex. E** (*Responses, pp. 3-4, Response to Interrogatory No. 4*). | Disputed.  Though Clayton acknowledged the creation of a spreadsheet and other documentation, it has never disclosed them.<br><br>(Exhibit 13 at 83:18–84:9). | |
| 62. All ten employees who received a ranking of "1" were terminated, as was one other employee. | Disputed.  In Clayton's response to each employee's EEOC charge, it claimed only | |

| | | |
|---|---|---|
| **Ex. E** (Responses, pp. 3-4, *Response to Interrogatory No. 4*). | eight employees were terminated.<br><br>(Exhibit 5 at 2 (claiming reduction was from 54 to 46); id. at 8–9 ("Mr. Ramos and the other seven terminated employees . . .")); Exhibit 6 at 2, 9 (same w/r/t Moreno) Exhibit 7 at 2, 7 (same w/r/t Ramos)). | |
| 63. The terminations occurred on February 25, 2016.<br>**Ex. E** *(Responses, pp. 3-4, Response to Interrogatory No. 4)*. | Undisputed | |
| | 6.   The Bank of America Project worked on year length contracts which could be cancelled with 30 days' notice.<br><br>(Exhibit 13 at 23:9–24:24). | |
| | 7.   Prior to the Plaintiffs' termination, there had been no move to cancel the Bank of America contract.<br><br>(Exhibit 13 at 23:9–24:24). | |
| | 8.   On February 26, 2016, Clayton advertised a new position accessible via its website: "Mortgage Service Specialist."<br><br>(Exhibit 2, Affidavit of Derwin Powell ¶¶ 23(a)–(g)); Exhibit 3 (Affidavit of Justin Moreno ¶¶ 17(a)–(g)); Exhibit 4 (Affidavit of Jesus Ramos ¶¶ 14 (a)–(h)); Exhibit 8 at 3, 6, 9). | |

| | | |
|---|---|---|
| | 9. The "Mortgage Service Specialist" job description included five bullet-pointed responsibilities.<br><br>(Exhibit 2, Affidavit of Derwin Powell ¶¶ 23(a)–(g)); Exhibit 3 (Affidavit of Justin Moreno ¶¶ 17(a)–(g)); Exhibit 4 (Affidavit of Jesus Ramos ¶¶ 14 (a)–(h)); Exhibit 8 at 3, 6, 9). | |
| | 10. Each of those responsibilities would have been the responsibility of a compliance analyst during the relevant period of time.<br><br>(Exhibit 14, Dep. Of Kathryn Withrow, at 56:4–57:13); Exhibit 2 (Affidavit of Derwin Powell ¶¶ 23(a)–(g)); Exhibit 3 (Affidavit of Justin Moreno ¶¶ 17(a)–(g)); Exhibit 4 (Affidavit of Jesus Ramos ¶¶ 14 (a)–(h)). | |
| | 11. But for the change in title, the "Mortgage Service Specialist" position was functionally identical to the Plaintiff's purportedly "eliminated" position. Exhibit 2<br><br>(Affidavit of Derwin Powell ¶¶ 23(a)–(g)); Exhibit 3 (Affidavit of Justin Moreno ¶¶ 17(a)–(g)); Exhibit 4 | |

| | | |
|---|---|---|
| | (Affidavit of Jesus Ramos ¶¶ 14 (a)–(h)). | |
| | 12. The new job listings were brought to the attention of Clayton in the EEOC proceedings.<br><br>(Exhibit 2, ¶¶ 24–26, Exhibit 3, ¶¶ 19–20; Exhibit 4, ¶¶ 16–17)) | |
| | 13. In response to each Plaintiff's EEOC charge, Clayton, through its vice president of Human Resources, Lynda Malmborg, denied any job listing for Denver was created.<br><br>(Exhibit 2, ¶¶ 24–26, Exhibit 3, ¶¶ 19–20; Exhibit 4, ¶¶ 16–17; Exhibit 5 at 8–9; Exhibit 6 at 9; Exhibit 7 at 7). | |
| | 14. Malmborg further claimed the only such listing was for the Tampa office, and that it was promptly taken down with no applications received.<br><br>(Exhibit 2, ¶¶ 24–26, Exhibit 3, ¶¶ 19–20; Exhibit 4, ¶¶ 16–17; Exhibit 5 at 8–9; Exhibit 6 at 9; Exhibit 7 at 7). | |
| | 15. This assertion to the EEOC was false.<br><br>(Exhibit 2, ¶26, Exhibit 3, ¶20; Exhibit 4, ¶ 17; Exhibit 8). | |
| | 16. The "mortgage service specialist" position was again re-listed on | |

| | | |
|---|---|---|
| | Clayton's website on May 26, 2016.<br><br>(Exhibit 2, Affidavit of Derwin Powell ¶¶ 23(a)–(g)); Exhibit 3 (Affidavit of Justin Moreno ¶¶ 17(a)–(g)); Exhibit 4 (Affidavit of Jesus Ramos ¶¶ 14 (a)–(h)); Exhibit 8 at 11) | |
| | 17.  On July 12, 2016, Clayton posted the "Compliance Analyst" position.<br><br>(Exhibit 2, ¶¶ 23(a)–(g); Exhibit 3 ¶¶ 17(a)–(g); Exhibit 4 ,¶¶ 14 (a)–(h)); Exhibit 8 at 12–14). | |
| | 18.  Clayton hired two "Compliance Analysts" and one "Compliance Team Lead" on June 6, 2016.  All three new hires were white.<br><br>(Exhibit 15, Clayton Supplemental and Amended Response to Plaintiff's First Set of Discovery at 3); Exhibit 14 (Withrow Dep.) at 70:5–10). | |
| | 19.  Clayton now asserts it has no records of these advertisements or any advertisements for the "Compliance Analyst" position from February to December, 2016.<br><br>(Exhibit 14 at 68:19–69:1; Exhibit 15 at 2–3) | |
| 64. Moreno filed a charge of discrimination on June | Undisputed | |

| | | |
|---|---|---|
| 14, 2016, and Powell and Ramos filed charges on June 20, 2016.<br>**Ex. F** (*Moreno dep., p. 221:9-221:20, Ex. 26*); **Ex. G** (*Powell dep., p. 204:1-204:14, Ex. 59*); **Ex. H** (*Ramos dep., p. 218:11-218:22, Ex. 54*). | | |
| | 20. Neil Hinch was responsible for supervising Derwin Powell and Justin Moreno at Clayton from November of 2014 to July of 2015, when he served as a team lead on the Foreclosure Team. He observed them both to be high performers with a willingness to learn, grow, and assist others on the team, and would personally recommend them for employment positions in the future.<br><br>(Exhibit 11). | |
| | 21. Megan Courtney worked as a Compliance Analyst on the Bank of America Project from November 2014 to July of 2015.<br><br>(Exhibit 12) | |
| | 22. During Ms. Courtney's tenure at Clayton she observed that she received preferential treatment over minority employees, and that minority employees were often grouped together | |

| | | |
|---|---|---|
| | and subjected to regularly changing standards.<br><br>(Exhibit 12). | |